STATE OF IOWA, Appellee, v. CHARLES T. COOPER, Appellant.

**FALSE PRETENSES:** Evidence Supporting Verdict—Sufficiency.
1 Evidence reviewed and held to support a verdict of guilt of obtaining property by false pretenses.

**FALSE PRETENSES:** Worthless Check Dated Ahead—Effect. The
2 fact that the worthless check upon which money was obtained was dated ahead one day has no effect on defendant's guilt when the uncontradicted testimony showed that when the money was obtained accused represented that he *then* had money in the bank to meet the check, when the evidence showed he had no money in the bank before, on, or after the date of the check.

**FALSE PRETENSES:** Indictment—Reliance on Pretenses—Suffi-
3 ciency of Allegation. To charge that accused, "by means of false pretenses (setting out the pretenses) did obtain, etc.," sufficiently charges that the property was parted with *in reliance upon the false representation.*

**INDICTMENT AND INFORMATION:** Form and Substance—Objec-
4 tion to—When Waived. Objections to the form or substance of an indictment not made before the jury is sworn are waived. (Sec. 5289, Sup. Code, 1913.)

PRINCIPLE APPLIED: Indictment for false pretense. After trial and in a motion in arrest of judgment the accused first raised the question that the indictment (a) did not sufficiently allege that the property was parted with in reliance "upon the false representation" and .(b) did not set forth the false pretenses. *Held,* in the instant case, if the objections had any merit they were waived under above principle of statute.

**CRIMINAL LAW:** Trial—Requested Instruction—Point Covered by
5 Court. The refusal of a requested instruction followed by the complete covering of the point in the court's instructions leaves no error.

**CRIMINAL LAW:** Appeal—Instructions—No Objections Before
6 Reading—Waiver. The court is under no obligation to review instructions as to which no objections were entered prior to the reading thereof to the jury. (Sec. 3705-a Sup. Code, 1913.)

CRIMINAL LAW: Instructions Considered as a Whole. It is an
7   ancient and threadbare rule that instructions must be construed
    as a whole. Instructions reviewed and held to be sufficiently
    connected.

CRIMINAL LAW: Trial—Verdict—Form·of—Sufficiency. ''We the
8   jury, find the defendant (naming him) guilty as charged,'' the
    instructions fully setting forth the offense, meets all legal re-
    quirements. (Sec. 5405, Code.)

CRIMINAL LAW: Insanity of Accused—When Criminal Proceeding
9   Suspended. The court is justified in refusing to suspend criminal
    proceedings and to empanel a jury to inquire into the sanity of
    the accused when the insanity of the accused was never in any
    manner suggested until after the court had opened proceedings
    to sentence the accused. (Sec. 5540, Code.)

CRIMINAL LAW: Trial—Improper Argument—Objection to—Suf·
10  ficiency. An objection ''to each and every word of said speech''
    made when the county attorney *arose* to make his argument, raised
    no question.

CRIMINAL LAW: Improper Argument—New Trial—When Granted
11  —Discretion of Court. Improper argument, of itself, is not
    ground for new trial. It is essential that it affirmatively appear
    that by reason thereof the accused has been deprived of a fair
    trial. Ordinarily the judgment of the trial court is superior
    on that question to the judgment of the appellate court.

FALSE PRETENSES: Excessive Sentence—Reduction. A sentence,
12  in instant case, to confinement in the penitentiary, reduced to
    confinement in the county jail.

*Appeal from Scott District Court.*—HON. M. F. DONEGAN,
Judge.

WEDNESDAY, MARCH 17, 1915.

DEFENDANT was convicted of the crime of obtaining money
by false pretenses, and appeals.—*Modified* and *Affirmed.*

*W. H. Petersen, Scott & Scott* and *Chezen & Kelley,* for
appellant.

*George Cosson,* Attorney General, and *John Fletcher,*
Assistant Attorney General, for the State.

PRESTON, J.—1. Appellant has made thirty assignments of error. They may be grouped as follows: Error of the court in overruling the defendant's motion for new trial and in arrest of judgment, because the verdict is not sup-

1. FALSE PRE-
TENSES: evi-
dence support-
ing verdict:
sufficiency.

ported by the evidence and is contrary to the instructions; that the indictment is defective; misconduct of the prosecuting attorney in the closing argument; refusal of the court to impanel a jury on the question of the defendant's sanity, which was demanded after verdict and when sentence was pronounced; error in the instructions given and in refusing to give instructions asked; and some other minor matters which will be referred to.

It appears, without any conflict in the evidence, that between eight and nine o'clock in the forenoon of June 10, 1913, defendant went into the place of business of one C. P. Fetterer in Davenport. Defendant asked Fetterer if he would cash a check for defendant, and, as the witness states it:

"I replied to that, 'Yes, sir. Yes, I will cash your check if you have money in the bank.' He said, 'Sure I have.' Then I said, 'In this bank on this check?' I had the check then; Mr. Cooper had given it to me. After he handed the check to me I asked him if he had money in the bank. I took the check and looked at it and looked at the other side, turning it over, and then I says, 'Have you got any real cash for the check? Have you money in the bank?' and he says, 'Yes.' I pointed out the name of the bank on the check and asked him if he had money in this bank, and he said yes to that. Then I cashed the check."

Witness testifies that he believed his statement, and on cross-examination says he had confidence in defendant. Later in the forenoon of the same day, the witness presented the check to the bank upon which it was drawn, and payment was refused. The check was dated June 11, 1913, but this witness testifies that he did not notice the date and did not know it was dated the 11th. The witness then went to defendant's

office and informed him that he had been to the bank and payment had been refused. Defendant took the check and looked at it and said that it was not due.

One O'Neal, an attorney who had an office with defendant, told the witness that he would have the money down at the bank at nine o'clock the next morning. Between ten and eleven o'clock the next forenoon, witness went to the bank, and payment of the check was again refused.

Witness Tellcamp, an employe of Fetterer in his saloon, was also present at the time the check was cashed and, while he did not hear all the conversation, he testifies that he did hear Fetterer inquire of defendant whether he had money in the bank named in the check, and heard defendant say that he had.

Witness Bruning, employed in the bank in question, testifies that defendant did not have an account at the bank on the 10th or 11th of June, 1913, and that he never had an account there at any time. He testifies that O'Neal came to the bank about four o'clock in the afternoon, after the bank had closed, and by the back door, and wanted to pay the check, and was informed that the check was not there. Bruning thinks this last named transaction was on the 11th of June, but O'Neal himself testifies that it was on the 12th and that it was after the matter had been placed in the hands of the county attorney and an information filed against the defendant, or at least prepared.

Witness O'Neal, for the defendant, testified to the visit of Fetterer to defendant's office on June 10th, and that he called Fetterer's attention to the fact that the check would be taken care of. He testifies that he went to Fetterer's place of business between two and three o'clock on June 12th and wanted to take up the check, but was informed by Fetterer that he did not have the check; that it was in the county attorney's office. O'Neal says that, being unable to make any arrangement in the way of a settlement, he left, and that after that, on the 12th of June, he went to the bank; that when

he went to the bank he offered to open an account and stated that he wanted to take up the check, and was informed by the bank that they did not have the check. He says he placed the money on the counter. He says the bank did not exactly refuse to let him open an account, and he did not do so and did not leave the money; that he intended to deposit the $20.00 he had with him in the name of Cooper; that he intended to open an account in Cooper's name, but did not do it, and that it was Cooper's money; that on the 12th of June, just before he went to the bank, he went to the county attorney's office and tried to settle the matter there; that this was about three o'clock in the afternoon of the 12th, and it was at that time that he saw papers in the office and inferred from the conversation that an information had been prepared.

The defendant himself testified as a witness and said that he cashed the check at Fetterer's place on June 10th; that the amount of the check was $13.00; identified Exhibit ''One'' which had been offered in evidence as the check; that the name on the check was his name and his signature; says he cashed the check with the intention that an ordinary man has that cashes a check, to pay it off; that he did not have any intention to defraud Mr. Fetterer out of that amount of money, or any other amount; that such an accusation is per-fectly insane; and that such a thought as that would be insane.

An attempt was made on cross-examination of Fetterer to get him to say that at the time the check was cashed defendant asked him if he would take a chance on him, or on cashing the check, but the witness denied that such language was used, and there is no other evidence in the case on that subject.

We have stated the substance of all the testimony. The verdict of the jury has abundant support in the testimony. In fact, in our opinion, there can be no question as to the defendant's guilt. There is no denial of the testimony of the two witnesses who heard the statements made at the time the check

was cashed. It is true the defendant testified that he did not intend to defraud, and it may be said there was a conflict as to this, but, from all the facts and circumstances, the jury were amply justified in finding that he did intend to defraud, and that the matter of attempted settlement or payment of the check occurred after the crime was complete and after the prosecution had been commenced. This disposes of the assignments of error in regard to the sufficiency of the evidence.

This is not a question of a person overdrawing his bank account by mistake, or believing the check would be paid even though overdrawn. This defendant never had an account at this bank, and there is nothing to show that he

2. FALSE PRE-
TENSES : worth-
less check
dated ahead:
effect.

expected the bank would pay it. The evidence was to the effect that defendant represented that he had money in this bank. It is unnecessary to determine whether the mere giving of the check alone was of itself a false representation, though it has been held that a false pretense or representation may be made by an act, as well as by word, and that a person's giving a check where there are no funds to meet it, knowing it will not be paid, is sufficient to constitute a representation. We are unable to see how the fact that the check was dated ahead one day is material under the facts of this case. As already stated, defendant did not have money at the bank either on the 10th or 11th or at any other time, and there is nothing to show that he expected the bank would pay it. The representation was that at the time the check was cashed he had the money in the bank, not that he would have at a future date. Defendant did not at the time the representation was made promise to pay the check at his office, nor was there any statement that he might not have money enough in the bank to pay the check. Dating it ahead was not a mere promise, and the jury may well have found that the whole transaction was a device to cheat. This decision is based upon the fact that false representations were made when the check was delivered.

2. It is alleged that the indictment is defective. When

arraigned, the defendant pleaded not guilty. There was no demurrer or other attack upon the indictment until after the trial, when it was sought to raise the ques

3. False Pre-
tenses: in-
dictment: re-
liance on pre-
tenses: suf-
ficiency of
allegation.

tion as to the sufficiency of the indictment by motion in arrest of judgment. The assignment of error is, that the indictment does not substantially conform to the requirements of the Code, in that it is defective in manner and form, as set out in the first ground of the motion in arrest of judgment. The particular grounds stated in the motion in arrest are, that it fails to charge that Fetterer parted with any money relying upon false representation, and because the indictment fails to set out the alleged false pretenses particularly, as required by law. The indictment charges, as to these two matters: "That the defendant did, unlawfully, feloniously, designedly, by means of false pretenses, and with intent to defraud, obtain from C. P. Fetterer, and of the property of C. P. Fetterer, Thirteen Dollars, lawful money, etc."; and as to the second supposed defect the indictment charges that the money was obtained by unlawfully, feloniously, designedly, by means of false pretenses, and with intent to defraud, representing that he had money in the Davenport Savings Bank, and presenting to said Fetterer as being worth its face value, and that it would be paid, a certain check, which is copied in the indictment. As to the second ground, the indictment does set out the representation that he had money in the bank, and as to the first, it charges that the money was obtained by the false pretenses.

It is contended by the State that the objection to the indictment is such that it comes too late by motion in arrest; that, under Chapter 227, Acts of the 33rd G. A., the objection

4. Indictment
and informa-
tion: form and
substance: ob-
jection to:
when waived.

should have been made before the jury was sworn. Sec. 9 of that act provides that all objections to the indictment relating to matters of substance and form which might be raised by a plea in abatement shall be deemed waived if not

raised by the defendant before the jury is sworn on the trial of the case. This section was construed in *State v. Boggs*, 166 Iowa 452, 461.

We are of opinion that the objections now urged, if they have any merit, are such as that they should have been made before the swearing of the jury, and they were waived by not making a timely objection.

Counsel for appellant concede in argument that it would have been better practice for defendant to have demurred to the indictment or to have moved to set it aside.

Furthermore, counsel for appellant seem to concede in argument that *State v. McConkey,* 49 Iowa 499, is against their contention. It was there said:

"The indictment charges that, by means of the false token and pretense, the defendant obtained from Hurst the property described. This allegation embraces the idea that Hurst relied upon the representations made, etc."

Other objections are now raised, with cases cited in support, which were not raised below. Such points require no further attention.

5. CRIMINAL LAW : trial: requested instruction: point covered by court. 3. Defendant requested an instruction, which was refused, to the effect that the intent to defraud must be proven. This point was fully covered in Instruction 10 given by the court. A part of 10 is:

"Whether said representations were false and untrue, and whether defendant knew that they were false and untrue, you must determine from all the evidence and circumstances in evidence in connection with said check and with what was said and done by both defendant and Fetterer, and which may throw any light on these questions; but you must further find that such representations were fraudulently made, that is, that they were made with a deliberately planned purpose and intent to deceive and to induce Fetterer to deliver to defendant the ownership and possession of said money. Intent and purpose are seldom, if ever, susceptible of proof by

direct or positive evidence, but are usually a matter of inference from facts and circumstances in evidence in the case, etc."

This is not in conflict with Instruction 6, which simply states the different propositions which the state must prove. No other instructions were asked by defendant. The mere fact, if it be a fact, that defendant intended to repay Fetterer at some future time in some other way, or to repay it if prosecution was commenced, would not of itself relieve defendant from guilt of the crime charged.

Substantially all the instructions given are assailed. We have considered all of them and conclude that every proposition involved was fully and properly covered and that there

6. CRIMINAL LAW: appeal: instructions: no objections before reading: waiver.

is no merit in the objections to them. We shall notice some of the objections briefly, although we are not required to do so for the reason that there was only a general exception to the giving of the instructions. Defendant did not, before the instructions were read, or in the motion for new trial, point out the grounds of objections specifically, as required by Chapter 289, Acts of the 35th G. A. The latter part of Instruction No. 8 reads:

"It is sufficient if it be proven to you beyond a reasonable doubt that defendant used language to said Fetterer by which he intended Fetterer to understand that he did in fact

7. CRIMINAL LAW: instructions considered as a whole.

have funds in said bank subject to his check, that the check was drawn in good faith, and would be paid when presented in due course of business, and that, from the language so used, Fetterer had a right to understand such to be the defendant's meaning. If you do not so find, your verdict should be for the defendant."

In argument, appellant has omitted the last sentence just quoted. This part of the instruction is objected to on the ground, as appellant states it:

"The court will notice that the trial judge did not preface the eighth instruction, or the objected part thereof, with the words, 'In connection with, or in addition to, what I have previously said and hereafter shall say, it is sufficient,' etc.; that it omits all question of specific intent, and all question of whether or not Fetterer acted thereon, etc."

The first part of that instruction refers to the second of the propositions which the court had stated was necessary for the State to prove, and is in regard to whether the defendant at the time he presented the check represented that he had money in said bank. It is clear that the portion objected to was in connection with what had been said before.

It has been repeatedly held that it is improper to select one instruction, or a sentence therein, and consider it by itself, but that the instructions must be considered together and as a whole.

Again, it is said that defendant was entitled to have his plea of not guilty stated properly to the jury as a material part of the formation of the issues for trial. This was clearly done in the first instruction, which reads in part:

"To this charge the defendant has interposed a plea of not guilty; it is, therefore, incumbent on the State to prove every fact essential to establish guilt in order to warrant conviction, and to do this the proof must be made fully, it must conform substantially to the allegations of the indictment and must establish guilt beyond any reasonable doubt."

Instruction 14 reads:

"If you find the defendant guilty, the form of your verdict should be: 'We, the Jury, find the defendant, Charles T. Cooper, guilty as charged.' If you do not find the defendant guilty, the form of your verdict should be: 'We, the Jury, find the defendant, Charles T. Cooper, not guilty.' When you have agreed upon your verdict, put it in writing upon a separate piece of paper and have it signed, etc."

8. CRIMINAL LAW: trial: verdict: form of: sufficiency.

The verdict rendered was according to the first form and properly signed by the foreman. The objection is, that the verdict should read that the jury find the defendant, Charles T. Cooper, guilty as charged in the indictment, etc. It is said by appellant that there was nothing to indicate what was meant by the word "charged," whether it referred to the indictment or to the judge's instructions, or something else. Instruction No. 1 reads, in part:

"The indictment in this case charges the defendant with the crime of cheating by false pretenses, as I shall hereafter more fully explain. To this charge the defendant has interposed a plea of not guilty."    -

The instruction in regard to the form of the verdict clearly refers to what is meant in Instruction 1. The instructions presented no charge against the defendant. The jury could not have been misled, and we ourselves are able to comprehend it and determine from the verdict the intent of the jury. The trial court seems also to have understood what the jury meant. Indeed, the verdict, in form, is more specific than the statute requires. Sec. 5405 provides that the jury must render a general verdict of guilty or not guilty, which imports a conviction or acquittal on every material allegation in the indictment, etc.

Counsel rely upon Secs. 5334 and 5335, and Secs. 5409 and 5410. The first two have reference to pleas by the defendant. Sec. 5409 provides for putting an improper verdict in form so that the intent of the jury may be understood. Sec. 5410 is on the same subject, and further provides that no judgment of conviction can be given unless the jury expressly finds against the defendant upon the issue, or judgment is given against him upon a special verdict.

Other objections are urged, but we do not consider them of sufficient importance to further notice them.

5. When the time had arrived for pronouncing judgment and the court was pronouncing sentence, counsel for de-

fendant moved that a jury be impaneled to inquire into the sanity of the defendant. This was denied. The statute provides (Sec. 5540) if a defendant appears in any stage of the trial of a criminal prosecution, and a reasonable doubt arises as to his sanity, further proceedings must be suspended and a trial had upon that question. Counsel then asked the court for permission to file a charge charging the defendant with being an alcoholic inebriate, as provided for by the Supplement to the Code, and to have the question determined whether or not he is not an alcoholic inebriate, so if the court is determined to pass sentence upon him, the defendant can be sent to the hospital for inebriates, and this was denied.

9. CRIMINAL LAW: insanity of accused: when criminal proceeding suspended.

There was no claim that defendant was insane when the crime was committed or when he was tried. Defendant was himself a lawyer. He cross-examined the prosecuting witness and other witnesses and examined some of his own, made objections to evidence, and testified briefly as a witness. No defense of insanity was interposed. This, of course, could have been done under the plea of not guilty, but there was no claim of that kind until time for sentence. No evidence was introduced on the subject, no medical witnesses, no instructions asked or given on this subject. During the trial defendant did, in his comments, say that a person who would do as it was claimed he had done would be insane, etc. Counsel now say, if they are given another trial, they will plead insanity.

It is claimed defendant was and had been a drinking man. When sentence was about to be pronounced, he addressed the court at some length and became wrought up considerably. It was at this point that the request was made for a jury. As stated, there was no competent evidence on the question as to his alleged insanity. The trial court saw him at the time and during the several days consumed in the trial and evidently had no reasonable doubt as to the sanity of the defendant. The court may have believed that it was

a shrewd move to escape punishment by indirectly claiming insanity. After counsel had requested a jury to inquire as to his sanity, defendant addressed the court and claimed that he was a wreck from drink and that his mind had been affected. It is said by his counsel in argument that, defendant being an attorney, his words were his oath, and that he there suggested his mental condition. By this, we suppose counsel mean that a professional statement by an attorney is equivalent to his oath. It has been so held in some cases, when the statement is given as a professional statement and accepted by the court as such. Such was not the case here. Defendant had just been convicted of crime and was pleading to be allowed to escape. It is, indeed, a most pitiful story, calculated to arouse the sympathy of everyone, to see a man of standing wrecked by drink and convicted of crime. Courts have often to deal with such cases, and, while we ought to consider the frailties of human nature, we ought not to be carried away by unsworn statements made under such circumstances. In his cross-examination of Fetterer, defendant blames the saloons and the saloon business for his downfall, justly so, perhaps, and yet no man in these days can commence the use of liquor without knowing in advance that it is likely to lead to destruction. He has been warned many times and knows the consequences. We would not be justified, on the record, in holding that the court erred in denying the request for a jury, on the question of sanity.

6. It is contended by appellant that there was misconduct on the part of the prosecuting attorney in his closing address to the jury, and that for this there should be a reversal. The entire closing argument was taken by the reporter and is set out in full in the abstract. This matter is not set out in the motion for new trial, or even referred to therein.

One ground of the motion for new trial is, that the verdict is the result of passion and prejudice, and this comes nearer than any other to reaching the matter now being considered. There was no objection or exception to that part of the argu-

ment now complained of, and there is no argument or objection here to the part which was objected to. The objection must be timely. *State v. Sale,* 119 Iowa 1.

When the county attorney arose to begin his argument, defendant asked that the reporter take down his speech, and stated that:

**10. CRIMINAL LAW: trial: improper argument: objection to: sufficiency.**

"The defendant objects and excepts to each and every word of said speech, and to the whole speech."

This is not a sufficient objection. We shall set out the parts objected to, and the objection. The county attorney said:

"Oh! There is much in this case, gentlemen, that they wanted to return the money. Why, is that a defense? Why you remember Commodore Fetterer, and he is rightly named the Commodore because he has exhibited some backbone in this case."

The objection was that Fetterer was not a Commodore, and that it is an expression used here like official positions, for the purpose of impressing the jury. The prosecutor continued:

"And when did he want to return the money? Commodore Fetterer—I don't care what you call him—Fetterer said that they never offered him any real money until after he signed the information. That is what he has told you, and there is no contradiction about that either."

The objection to this was, that it was a misstatement of the evidence as testified to before the jury. There was no material misstatement of the evidence, and it was a question for the jury what the evidence was.

No other objection was made to any part of the argument. It may be that a part of the argument now alleged to have been improper was so, unless it was in answer to, or

invited by, the argument for defendant. That part of the argument is:

"This case, as I look at it, gentlemen, is an important case. It involves various propositions. I could say the amount is not large. No, measured by financial measure, the case is not so important, but it is greatly important on account of the questions involved in it. It involves for one thing the question whether this floor in this courtroom is level or not.

"It involves the question whether people with professional degrees or education shall be tried by the same rules of law and be meted out the same kind of justice as some poor boy who never had a chance anywhere—never had a chance in life. How many of these kind of cases do we see in court? Some poor boy has no schooling, perhaps an orphan, loses his mother and gets into bad company, and the first thing you know he goes and commits a crime, possibly like this; and you know, my friends, what they do with him.

"Now, I ask that this defendant, regardless of his intelligence, education or profession, be tried by the same rules of law, and that you give him justice, no more no less, but get exact justice in his case.

"It involves the proposition whether attorneys can be prosecuted or not. It involves the proposition whether when you do or whether you or your family go to attorneys with a property matter, whether you can trust them. It involves the honor and integrity of the Scott County Bar. It involves the proposition whether when men are educated at the people's expense and receive their license to practice an honorable profession at the people's expense, whether then in return they can turn upon the community and prey upon it.

"It involves the proposition of whether saloonkeepers shall be protected from this kind of petty holdups. Aye! in this case they met a man who had a little backbone and he complained. But few saloonkeepers would complain under the circumstances. I think you, gentlemen, can infer as a matter of common knowledge how they run up against the wrong

man. This is why this case is here. I say, gentlemen, for some reasons, different ones, this is an important case, regardless of the amount· involved.

"We have had a good deal of agitation here, gentlemen, in saloon circles. We have a right to take into consideration what we know here. Use a little common sense. We don't have to forget what we know. We know this. We know that saloonkeepers in this community, under the mulct law and prohibitory law, live in glass houses, and they are afraid at any time that some little irregularity, without knowing it, they will violate the law. They live a life of fear, and you can get them on any tack. As my old friend, William O. Schmidt says, 'Peace to his ashes.' They never intended when they passed the law in the legislature when I was there, they never intended that a man should live in safety under the mulct law. It is the easiest thing in the world to get them. And we can draw any fair reasonable inference in this case. Cooper went in there and· knew the man as a saloon keeper, and we have a right to draw the fairest in the world, that he figured that Fetterer would not make a hollow about thirteen dollars. But if it had been a large amount, the amount of money might have outweighed his fears, and then he would have made a hollow. And so he didn't make it a large amount; he made it a small amount, thirteen dollars. Why, the fact that it is a small amount shows that he intended to defraud, shows how cunningly the plan was laid. He didn't think Fetterer would say anything, and the amount being small. But he reckoned with the wrong man. There is a man without fears in his system; a man that will come to the front and keep the laws up in this community. He met the wrong man, that is what he did, when he ran up against Fetterer."

It is true it does not appear clearly that this argument was in answer to defendant's argument, nor does it appear that it was not so. The trial court heard all the arguments and the entire trial, and in overruling the motion for new

trial, conceding any ground of the motion applied to this matter, held that there was no prejudice.

The rule is that mere misconduct of counsel is not enough alone to require the granting of a new trial, unless it appears

11. CRIMINAL LAW: improper argument: new trial: when granted: discretion of court.

to have been so prejudicial as to deprive the complaining party of a fair hearing of his case by the jury on the evidence. The trial court having heard all that took place on the trial, we ought not to interfere with his discretion in refusing a new trial. *State v. Thomas,* 135 Iowa 717; *State v. Waterbury,* 133 Iowa 135; *State v. Norman,* 135 Iowa 483; *State v. Wilson,* 157 Iowa 698.

If we were to reverse for this, it would be for the purpose only of giving defendant another chance to go free, and this, too, when the evidence shows clearly, and without any substantial dispute, that he is guilty. Such is not the purpose of appeals to this court.

While the argument for defendant to the jury is not shown, the record does show that in cross-examination of Fetterer, defendant was abusive and referred in his questions and comments to Fetterer's business as the cause of defendant's downfall. The county attorney in other portions of his argument referred to these matters, saying that defendant tried "to browbeat, insult and taunt Fetterer," and:

"All the things that were hurled at him with the intention of stirring him (Fetterer) up, he sat there just as calm as a soldier and answered the questions. He didn't come here vindictive, with an enmity toward Mr. Cooper. He told you that at the time the check was passed he had no enmity against him. He told you he had actually confidence in him."

And again:

"He (Petersen, counsel for defendant), tells you here that he was going to drag out the nigger from behind the woodpile and going to make him crawl and creep, and he

used that possibly a dozen times, holding up his hands, 'Now, watch, and don't forget the nigger behind the woodpile.' "

Again the county attorney said:

"They insinuate and charge that there is something wrong somewhere. Well, we are not allowed to guess anything in the case that is not here."

These matters are referred to as tending to show that counsel for defendant may have made some remarks not entirely justified by the record and which the prosecutor in his remarks was answering. We are justified in this inference from the record and arguments in this court. We shall refer to a part only of a number of statements entirely outside the record. Counsel have filed a suggestion of the diminution of the record and a motion in this court to have certified the proceedings and evidence in another proceeding, had since the trial of the instant case, and which has no connection with it. The record and evidence in that case have been certified. Counsel for appellant say in argument that at the time of the transaction in question:

"Defendant was in good standing so far as charges ever having been preferred against him are concerned. Defendant was a widower, having been deserted by his wife. He was a bad cripple, being lame in one of his legs and feet and was and had been an invalid for several years, suffering from various diseases, and had only recently been obliged to undergo an operation for appendicitis—and in addition thereto was a victim of excessive use of whisky and tobacco, to such an extent as to be a complete nervous, mental and physical wreck, although at no great distant date was a man of extraordinary power of mind and of strong influence and possessed of considerable wealth, and was for nearly two decades past looked upon by the people of Scott County, and a good part of the State, as one of its shrewdest trial lawyers and ablest politicians, was both loved and feared and was hated by his

enemies with a persistent hatred because of his successful rivalries. His marital ventures were two, each wife having deserted him, and his melancholy at times knew no bounds, and remorse and melancholy, feeding on the mind, ate away the man and he became, and was, insane. For a year or more immediately prior to this unhappy incident, he had engaged in various conduct which laid him open to criticism, much of which except in the mind of those who are able to know the man and his true condition, would perhaps justly lay him open to the criticism which his enemies and those indifferent to the name of friend or enemy almost constantly heaped upon him. He came of one of the oldest and best families of the pioneers of Scott County and was highly educated, at his own expense, and not at the expense of the county, as was charged by Mr. Vollmer—an Irishman by blood, and for years was true to the Milk-white-Hind, but the passion for drink, encouraged by our system of politics, drew its slimy coils about him and bore him away from family, from church, from wife, from himself.''

There is more of the same kind. There is no evidence to support these statements. To support some of them, reference is made to the address of defendant when speaking to the court and not under oath. So that we have the assertion of counsel here based upon the assertion of the defendant. Other assertions are without any basis. The purpose is apparent. The assumption seems to be that this court does, or ought to, decide cases without any regard to the facts or law, and upon assertions of counsel, or through sympathy for a defendant. Counsel insist that the State must strictly comply with the rules, and yet seem to think that the defendant may disregard all rules. It sometimes occurs that there is no meritorious defense and that resort must be had to such means as the only hope of escape.

7. There is no assignment of error that the judgment is

excessive. It is suggested in oral argument. Defendant was sentenced to seven years in the penitentiary. Under the statute, he could have been given a jail sentence. From what we.know of the circumstances of the case, to serve a term of seven years would be too harsh a punishment. It is not to be supposed that there was any intention that he should serve the full term. There may be circumstances surrounding the defendant, his history and condition, which would justify leniency, or even a pardon, but which would not be properly shown in the record of the trial, or there may be circumstances against him which would clearly be improper and prejudicial to show in the trial. Counsel for defendant asserts that defendant is of the highest standing. The State, in answer to this, says that there is another indictment against the defendant for embezzlement. This is admitted by the defendant, but he says the circumstances were such that an indictment ought not to have been found, and that it has been or will be dismissed. But this whole matter is outside the record. The point I want to make is, that such things are proper to be considered by the board of parole. The theory, or one purpose, as I understand it, of the indeterminate sentence law is to permit a more thorough examination of such matters, and then determine what, under the facts in each case, the punishment ought to be. Obtaining money by false pretenses, though the amount is not large, is not a petty offense by any means. I would be willing to leave the entire matter of punishment to the board of parole and the governor. I am willing to assume that they have the same sense of duty as the court. We have the power to modify the judgment, still it seems to me the power ought to be exercised with caution. We ought not to assume too much the functions of the board of parole, the governor, the legislature, trial courts and trial jurors. A majority of the justices think the judgment should be reduced, and that it is their duty to determine whether the sentence shall be to the penitentiary or jail,

12. FALSE PRE-
TENSES: ex-
cessive sen-
tence: reduc-
tion.

and it is reduced to six months in jail. All points assigned and argued have been considered and we have noticed those in the opinion which seem to merit attention.

The motions for leave and to vacate the judgment are over-ruled. The judgment appealed from is—*Modified* and *Affirmed*.

LADD, EVANS, GAYNOR and SALINGER, JJ., concur in the result. WEAVER takes no part. DEEMER, C. J., agrees with PRESTON, J., that in this case the matter of punishment should be left to the board of parole or governor.